SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X  Index No.

Q BIOMED, INC.,

             *Plaintiff,*

    *-against-*                     **VERIFIED COMPLAINT**

BIONUCLEONICS, INC., ROSEANNE SATZ,
STANLEY SATZ, ADVANCED INNOVATIVE
PARTNERS, INC., ADVANCED IMAGING
PRODUCTS, INC., NUCLEAR ENTERTAINMENT
GROUP, INC., PLAYMORE COUTURE, INC. and
MISS ROSE THEORY,

             *Defendants.*

-------------------------------------------------------------------X

       Plaintiff Q BIOMED, INC. ("Plaintiff" or "Qbio"), by and through their undersigned

counsel, as and for their Verified Complaint against Defendants BIONUCLEONICS, INC.,

ROSEANNE SATZ, STANLEY SATZ, ADVANCED IMAGING PRODUCTS, INC.,

NUCLEAR ENTERTAINMENT GROUP, INC., PLAYMORE COUTURE, INC. and MISS

ROSE THEORY (collectively, "Defendants"), alleges the following:

### PRELIMINARY STATEMENT

      1.     In or about the spring of 2016, Plaintiff entered into a license agreement with

Defendant BioNucleonics, Inc. ("BNI") to fund BNI's re-commercialization of one of its

dormant products, a radiopharmaceutical drug in exchange for cash and stock compensation and

an agreed-upon royalty.

      2.     Through 2012, Defendant had manufactured and sold this drug.  However, upon

information and belief, it was forced to withdraw it from production and sale by the end of that

year due to its insolvency.

3.    Both Plaintiff and Defendant BNI recognized that bringing this drug back to the market could be extremely profitable, yet extremely expensive to accomplish. Since Plaintiff had the necessary capital, and Defendant BNI had the rights to the drug, it made sense to work together on re-commercializing this drug and sharing in the profits. During the parties' initial discussions on this topic, Roseanne Satz ("Roseanne") and Stanley Satz ("Stanley"), BNI's two chief executives and owners of BNI, estimated that this drug could be brought back to market within ninety days or so at an estimated cost of $750,000.

4.    Based upon the Satzs' representations, Plaintiff agreed to fund the entirety of this re-development cost in exchange for the exclusive rights to this drug through an exclusive license agreement which also gave Plaintiff the option to acquire BNI's rights to this drug in perpetuity.

5.    Once the drug was ready for market, Plaintiff would have the exclusive rights associated with this drug, including the exclusive right to manufacture, distribute and sell this drug to the public anywhere in the world and in perpetuity. In exchange for these rights, in addition to funding the drug's recommercialization efforts, Plaintiff agreed to pay BNI cash, stock and a 20% royalty on all sales, with minimum royalties in the first year of $50,000, $100,000 in the second year, and no less than $150,000 thereafter.

6.    The parties' understanding was memorialized in writing, first in a Letter of Intent executed by the parties in or about March 2016, replaced shortly thereafter by a formal Patent Technology License and Purchase Agreement signed by the parties in late June 2016.

7.    The Agreement established a liberal timeline for completion of the drug's redevelopment (200 days), a liberal budget of $850,000, and a funding schedule which outlined when Plaintiff's capital was required and how this capital was to be utilized by Defendant BNI.

2

Plaintiff also agreed that upon hitting certain milestones, Plaintiff would transfer hundreds of thousands of shares of its common stock to BNI (and/or to one or both of the Satzs) as additional consideration.

8.      Upon execution of their formal Agreement, Plaintiff began sending BNI substantial sums of money which BNI was supposed to utilize solely in the development of the drug. However, Plaintiff discovered that many, if not most of the representations made by Roseanne and Stanley Satz inducing Plaintiff to enter into the License and Purchase Agreement were knowingly false and intended solely to induce Plaintiff's cash and stock distributions to BNI.

9.      The Satzs routinely and repeatedly lied to Plaintiff about the expenses associated with this re-development, where Plaintiff's money was actually going, and the timetable for completing its commercialization. Far from completing this re-commercialization within 200 days, it has now been over two and a half years since the parties entered into their Agreement. During this time, Plaintiff has invested over $950,000 in cash, plus an additional $200,000 worth of its common stock. Contractually, they are the exclusive licensee of this drug, and arguably, the exclusive owner having rightfully exercised its right to acquire this drug outright.

10.     Notwithstanding Plaintiff's full and complete performance of its obligations under the Agreement, Defendant BNI has refused to honor its contractual obligations to Plaintiff leaving Plaintiff with nothing to show for its investment.

11.     This lawsuit seeks various equitable and legal remedies against Defendant BNI for its many breaches of contract, and against BNI and the Satz Defendants for fraud and fraudulent inducement of Plaintiff. Plaintiff also seeks to permanently enjoin BNI from interfering with Plaintiff's exclusive rights to this drug, and to compel BNI to take the necessary

3

final steps to turn over to Plaintiff all of the assets it acquired from BNI for fair and valuable consideration.

12.     In addition to the foregoing, Plaintiff also seeks both equitable and legal remedies against the other named Defendants herein, based upon these parties' misappropriation of Plaintiff's capital.

## THE PARTIES

13.     At all relevant times, Plaintiff was and is a Nevada corporation whose common stock is publicly traded on the OTCQB and whose princpal place of business is 366 Madison Avenue, 3rd Floor, New York, New York 10017.. Formed in 2015, Plaintiff's primary business is licensing, financing and developing underfunded biotechnology assets from companies such as this one from BNI.

14.     Upon information and belief, at all relevant times, Defendant BioNucleonics, Inc. ("BNI") was and is a foreign corporation primarily owned and run by Roseanne and Stanley Satz with its principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

15.     Upon information and belief, at all relevant times, Defendant Roseanne Satz is an individual residing in or around Boca Raton, Florida, with her principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

16.     Upon information and belief, at all relevant times, Defendant Stanley Satz is an individual residing in or around Boca Raton, Florida, with his principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

17.     Upon information and belief, at all relevant times, Defendant Advanced Innovative Partners (formerly Advanced Imaging Projects, Inc.), was and is a foreign corporation

4

primarily owned and run by Roseanne and Stanley Satz with its principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

18.    Upon information and belief, at all relevant times, Defendant Playmore Couture, was and is a foreign corporation primarily owned and run by Roseanne and Stanley Satz with its principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

19.    To the extent Defendant Playmore Couture is not an incorporated entity, then upon information and belief, Playmore Couture is a limited liability company whose majority members include Roseanne and Stanley Satz.

20.    Upon information and belief, at all relevant times, Defendant Nuclear Entertainment Group was and is a foreign corporation primarily owned and run by Roseanne and Stanley Satz with its principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

21.    To the extent Defendant Nuclear Entertainment Group is not an incorporated entity, then upon information and belief, it is a limited liability company whose majority members include Roseanne and Stanley Satz.

22.    Upon information and belief, at all relevant times, Defendant Miss Rose Theory was and is a foreign corporation primarily owned and run by Roseanne and Stanley Satz with its principal place of business located at 3651 Fau Blvd., Boca Raton, Florida 33431.

23.    To the extent Defendant Miss Rose Theory is not an incorporated entity, then upon information and belief, it is a limited liability company whose majority members include Roseanne and Stanley Satz.

5

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over Defendant BNI pursuant to CPLR §302(a)(1) insofar as BNI transacts business within the state of New York, and the causes of action herein arise from such business transaction.  This Court also has personal jurisdiction over Defendant BNI insofar as BNI consented to jurisdiction in New York pursuant to the Agreement between BNI and Plaintiff.

25.     This Court also has personal jurisdiction over all Defendants pursuant to CPLR §302(a)(3)(ii) insofar as Defendants committed tortious acts without the state causing injury to a person or property within the state, and Defendants expected or should reasonably have expected their respective acts to have consequences in the state, and they derive substantial revenue from interstate or international commerce.

26.     Venue is proper in New York County pursuant to CPLR §§503(a) and (c) insofar as Plaintiff is a domestic corporation or a foreign corporation authorized to transact business within this state, and its principal place of business was and is located in New York County at the time this action was commenced, and Plaintiff designated New York County as the proper venue for prosecuting its claims against these parties.

27.     Venue is also proper within this state insofar as the Agreement between Plaintiff and Defendant BNI, from which Plaintiff's claims arise, states that any and all disputes arising from this Agreement shall be resolved in a court sitting in New York County.

## STATEMENT OF FACTS

**A. Strontium Chloride Sr-89 Injection, USP ("Strontium 89" or the "Drug")**

28.     At all relevant times, Strontium 89 was and is a generic FDA-approved, non-opioid radioactive drug approved by the FDA on the 6th of January 2003, and awarded to its

6

applicant, BNI. The original branded drug (Metastron™) was approved by the FDA in June

1993. The Drug was found to effectively relieve bone pain in patients with painful skeletal

metastases which occur when cancer cells break away from the primary tumor they are part of

and travel through the bloodstream settling in another other parts of a patient's body where they

begin growing.

29.     The Drug at issue here has been found to dramatically improve a suffering cancer

patient's quality of life by alleviating severe pain and suffering resulting from bone metastases,

thereby reducing or eliminating altogether the need for opioid analgesics.

**B. BioNucleonics Inc. (BNI)**

30.     BNI was and is a small privately held father and daughter-run

radiopharmaceutical company located in South Florida. BNI is primarily operated by the

daughter Roseanne Satz ("Roseanne") but with substantial involvement and participation by her

father, Stanley who it has been represented has the final decision-making capacity. Through

2012, when BNI became insolvent, one of the products the company had previously developed

and marketed was Strontium 89. By the end of that year, BNI was forced to cease manufacture

and distribution of Strontium 89, its only commercial product, due to its financial insolvency.

31.     Notwithstanding the foregoing, it was believed that with sufficient capital, and in

the right hands, this Drug could be reintroduced into the commercial market and generate

significant revenues for its manufacturer, distributor.

**C. Q Biomed Inc. ("QBIO")**

32.     Plaintiff QBIO is a publicly-traded, New York-based company focusing primarily

on spotting and investing in underfunded biotech companies, such as BNI, and in doing so,

7

providing the means by which these underfunded companies might return to profit and serve desperate patients.

33.     To incentivize Plaintiff, by formal agreement, Plaintiff was granted an exclusive, world-wide license to manufacture, distribute, promote and/or sell one or more of their target company's products, with an option to acquire the asset(s) outright, in exchange for it providing the working capital and additional managerial expertise needed to bring that product to market. Once Plaintiff generated revenues from the sale of product(s), Plaintiff would share a percentage of all profits generated from said sales with the product owner (licensor) in the form of a royalty, often guaranteeing the licensor a minimum annual royalty agreed upon by the parties.

### D.  Early Relationship between BNI and Q Biomed

34.     In or about September 2015, Plaintiff became interested in BNI and in particular, Strontium 89.  During the course of its due diligence, Plaintiff learned more about the Drug's effectiveness and saw the potential demand for it and thus, the potential profitability in re-commercializing this product.  Plaintiff also learned that while BNI owned the exclusive rights to its Strontium 89 Drug, it lacked the financial resources to return this product to the market. Plaintiff was well-capitalized and saw this as a potential win-win for both itself and for BNI.

35.     In discussions with BNI's principals, Roseanne and Stanley Satz, Plaintiff proposed an agreement whereby it would provide the capital needed to return Strontium 89 to the commercial marketplace in exchange for granting Plaintiff an exclusive license to manufacture and sell the Drug commercially with an option to acquire this asset from BNI outright. Roseanne and Stanley represented that they had all technical knowledge, expertise, experience and commercial relationships necessary to bring the Drug back to the market. The only missing ingredient, according to them, was funding.

8

36.     In further consideration for all these rights, Plaintiff would share with BNI a percentage of all revenues derived from the Drug's sales – on an on-going basis, guaranteeing BNI a minimum amount of money each year whether Plaintiff was able to achieve that level of success or not –known as a minimum annual royalty.  Pursuant to this type of arrangement, both companies stood to earn significant sums of money on a product that lay dormant since 2012.

37.     In crafting an agreement between Plaintiff and BNI, these parties did an analysis of how much time and money it would take in order to effectuate the re-commercialization  of Strontium 89.  During these discussions, Roseanne and Stanley Satz both painted an extremely positive picture declaring that this product could be market ready within 90-days at a cost of less than $800,000 of which $755,000 would be needed for raw materials, production runs, marketing materials, FDA-required fees, and general and administrative costs.

**(i)  License and Patent Purchase Agreement**

38.     Relying upon the Satzs' representations and warranties, between January and May 30, 2016, Plaintiff and BNI formalized its relationship, first through a Letter of Intent ("LOI"), followed by a more formal Patent Technology License and Purchase Agreement ("Patent Purchase Agreement" or the "Agreement") executed by them in or about May 30, 2016.  A copy of this Patent Purchase Agreement is annexed herein as **Exhibit "A."**

39.     Pursuant to Paragraph 2.1 of the Agreement, in exchange for an initial cash and stock payment to BNI, Plaintiff was granted an exclusive, world-wide license to manufacture and sell Strontium 89, among other things, with an option to acquire these rights in perpetuity.

40.     Section 2.1 of the Agreement provides the following:

**"License of BNI IP**. Subject to the terms and conditions of this Agreement and in exchange for Q Bio's payment of the Initial Cash Payment and Initial Stock Payment (each, as defined herein), BNI hereby grants to Q Bio and its present and future Affiliates, effective as of the Closing, a worldwide, exclusive, perpetual (subject to

**9**

Section 2.4 of this Agreement) and transferable (subject to Section 12 of this Agreement) license (with the right to sublicense through one or multiple tiers solely as set forth in this Agreement) under the BNI Assets to research, develop, make, have made, use, have used, import, sell, have sold and otherwise commercialize and exploit any BNI Assets."

41.    In addition to licensing the exclusive rights to commercially exploit Strontium 89 in the commercial marketplace, the parties also agreed that Plaintiff would have the exclusive right to acquire all of BNI's right, title and interest in Strontium 89.  Section 2.3 of the Agreement provides, in material part, the following:

> **"Option to Purchase BNI Assets.** At the Closing, BNI grants Q Bio an option to purchase the BNI Assets (the "**Option**") for the Total Cash Investment (as defined in Section 3.2(b)). Upon full payment of the Total Cash Investment, Q Bio may exercise the Option by providing written notice of its decision to exercise the Option to BNI. Promptly, but no more than 10 Trading Days after it has provided such notice to BNI, BNI shall deliver to Q Bio all documents reasonably required by Q Bio to assign and transfer the BNI Assets and, for any Technology that is not BNI IP and is instead licensed to BNI, BNI shall, assign such licenses to Q Bio where the foregoing is permitted under the terms of such license...."

42.    The "Closing" on this transaction was contemplated to take place on or before April 2016 (see *Agreement, Section 3.1*).  That date would eventually come and go before the parties executed their initial draft Agreement in late May 2016.

43.    In exchange for the license rights granted to Plaintiff, Plaintiff agreed to pay Defendant cash and stock, each distributed to BNI upon the happening of certain events. Pursuant to Section 3.2(a) of the Agreement, Plaintiff agreed to transfer to BNI up to 110,000 shares of Plaintiff's common stock as follows: 50,000 shares upon Closing; 20,000 shares upon BNI's successful amendment to  what is known as an Amended New Drug Application or "ANDA" and the related Market Authorization (FDA granted authority to market the drug in the USA); and an additional 40,000 shares of upon Plaintiff's first sale of Strontium 89. (*See Agreement,* Section 3.2(a)(i)-(iii).

10

44.     At the time this Agreement was entered into, Plaintiff 's common stock was trading at about $3.20 per share and thus the 110,000 shares to be distributed to Defendant were worth approximately $350,000 on a market capitalization of approximately $28 million.

45.     Plaintiff also agreed to allocate and fund up to $850,000 to be used to re-commercialize the Drug. Plaintiff agreed to advance the first $100,000 within the first 30 days ($50,000 upon execution of the Agreement, an additional $50,000 within 30 days thereafter) with the remaining $750,000 to be distributed in accordance with a schedule outlining a timeline to be mutually agreed upon by the parties (*see, Schedule 3.2(b)*) but in no event longer than 12-months (*see, Agreement* Section 3.2(b)).

46.     Pursuant to Section 3.3 of the Agreement, Plaintiff also agreed to pay BNI a royalty on gross profits of 20% in perpetuity.  (S*ee, Agreement*, Section 3.3(a)).

47.     In order to avoid reversion of Plaintiff's rights relative to Strontium 89 under the Agreement, the parties agreed, and incorporated into their Agreement, Schedule 2.4(ii) which provided for a first sale of the Drug to occur no later than 12 months after BNI had completed all regulatory and manufacturing tasks necessary to commercialize the Drug.  Plaintiff also guaranteed it would hit minimum sales targets for each of years 1 through 3, as follows:

> Year 1: $750,000
> Year 2: $1,000,000
> Year 3: $1,500,000

48.     The Agreement further provided for Stanley and Roseanne Satz to have seats on Plaintiff's scientific advisory board, with the possibility of additional options to acquire additional shares of the Plaintiff's common stock based on performance.

49.     The Agreement also contained the usual restrictive covenants, including BNI's prohibition of selling, assigning and/or transferring its intellectual property rights in Strontium

11

89 to any third parties without Plaintiff's prior written consent. *See Agreement,* Section 2.2. BNI

also agreed not to directly or indirectly compete with us as it related to Strontium 89, unless, of

course, our rights reverted back to Defendant. *Id.* at Section 5.

50.    In establishing this mutually agreed upon timeline (Schedule 3.2(b)), Plaintiff

relied upon those representations made by the Satz family, as memorialized in the

parties' Agreement, which included the following representations and warranties:

> **"Ownership of BNI Assets**. BNI (A) is the owner of all of the BNI Assets and it has
> good and valid title to the BNI IP; (B) owns the BNI Assets free and clear of any
> liens, security interests, licenses, charges, encumbrances, equities, claims or similar
> restrictions; and (C) is not a party to and is not bound by any agreement or
> understanding (whether written, oral, express or implied) relating to any of the BNI
> Assets, and there is no agreement, understanding, order or decree to which any of the
> BNI Assets is subject."

*See, Agreement,* Section 4.1(i).

> "To the Knowledge of BNI, there are no investigations, suits, claims, actions or
> proceedings against or affecting BNI or any Affiliate relating to BNI Assets,
> including those relating to or arising under applicable Legal Requirements relating to
> government health care programs, private health care plans, or the privacy and
> confidentiality of patient health information."

*See, Agreement,* Section 4.1(iii)(e).

51.    Just ahead of executing the original draft Agreement, Plaintiff came to discover

that Roseanne and Stanley Satz had been less than forthcoming about the scope and nature of

their outstanding debts and thus, the truthfulness of the above-referenced representations and

warranties.  Upon further scrutiny, Roseanne Satz confessed that BNI had two judgments against

it – one in favor of its former landlord representing back rent; the other in favor of the IRS

representing unpaid payroll taxes totaling more than $600,000.  Plaintiff insisted that these

judgments be extinguished as a condition to Plaintiff moving forward with its

licensing/acquisition deal.

12

52.    Plaintiff was informed by Roseanne Satz that if they had the capital, which they did not, they could satisfy both of these judgments for $163,500 or less. Confident in the future success of Strontium 89, Plaintiff agreed to fund BNI's settlement efforts up to $163,500 in order to free up BNI to focus on the re-commercialization of its Drug, and to clear any existing encumbrances to its assets. This $163,500 was in addition to the $850,000 Plaintiff had agreed to pay, as set forth above.

53.    The parties settled upon the following revised 'use of proceeds' schedule (*see Agreement,* Schedule 3.2(b)) which served to establish a timeline for the allocation of Plaintiff's money:

| Day 1 | Up Front Payment | $50,000 | Payment to BNI, G&A, Travel |
| Day 30 | Raw Material Isotope | $50,000 | Payment to Polatom |
| Day 45 | API (Active Pharmaceutical Ingredients) Fee | $56,000 | Payment to FDA |
| Day 60 | Raw Material Isotope | $75,000 | Payment to Polatom |
| Day 60 | Process Validation Stability Study | $25,000 | Payment to Isotex[1] |
| Day 90 | ANDA Fee | $76,000 | Payment to FDA |
| Day 120 | G&A | $25,000 | Payment to BNI |
| Day 120 | Production of FDP | $50,000 | Payment to Polatom & Isotex Validation |
| Day 150 | Production of FDP | $50,000 | Payment to Polatom & Isotex Validation |
| Day 160 | Production of FDP | $50,000 | Payment to Polatom & Isotex |
| Day 170 | G&A | $20,000 | Payment to BNI |
| Day 180 | Domestic FDP Fee | $273,000 | Payment to BNI |

---

[1] IsoTex was BNI's primary manufacturer of its Strontium 89.

13

| Day 200 | Campaign Strontium ("Launch Date") | $50,000 | Payment to Third Parties |
| | **TOTAL** | **$850,000** | |

54.     In crafting this schedule, Plaintiff was forced to rely almost exclusively on the Satz's professed knowledge and experience in how best to bring Strontium 89 back to commercialization. Roseanne and Jack Satz repeatedly represented to Plaintiff that they knew better than Plaintiff which suppliers to use, how much their products and services would cost, and a timeline for when the money would be needed. Although $755,000 of the $850,000 was to pay third party suppliers and vendors in the production of the Drug, Roseanne insisted that such funds be sent through BNI as it had previous and existing commercial relationships with those parties and wanted to maintain those relationships.

55.     In Plaintiff's naivete, Plaintiff assumed that the funds it provided to BNI would be used solely by BNI and solely for the purposes and in the amounts agreed to between the parties during their numerous discussions and thereafter in the parties' Use of Proceeds Schedule. Upon information and belief, the Satzs consistently used funds earmarked soley for BNI in one or more of their other business ventures, all under common control of the Satzs.

56.     Wanting to take some of the pressure off of BNI, Plaintiff agreed to a longer timeline to reach commercialization increasing the re-development time from 90 to 200 days. Plaintiff also agreed to a more conservative budget, increasing the estimated development costs from $750,000 to $850,000.

57.     Plaintiff made it clear to BNI that it was unwilling to officially close on its deal with BNI before BNI had extinguished its existing judgments.  Since no one knew specifically when that would occur, the parties could not set a specific closing date.  For this reason, their

14

Use of Proceeds Schedule referred to the closing date as "Day 1," and the remaining dates as "Day 30," "Day 45," etc. By doing it in this manner, the parties any delay in the start date would not necessitate a further modification of their Use of Proceeds Schedule.

58.    Again, not knowing how long it might take for BNI to negotiate the satisfaction of its judgments, and wanting BNI to begin the re-commercialization process sooner rather than later, Plaintiff agreed to accelerate a portion of its "up front" payment in order to provide BNI with some good faith working capital. On June 7, 2016, Plaintiff forwarded $10,000 to BNI to be used for BNI's travel and general administration expenses.

59.    With Plaintiff's assistance and its capital, BNI was able to compromise its $580,000 debt with its previous landlord for $62,500 payable in six installments beginning at the end of that month. Having resolved its largest debt, Roseanne and Jack Satz represented to Plaintiff that a deal with the IRS to resolve the IRS debts was close at hand and would be accomplished by the end of June 2016.

60.    At the time Roseanne and Jack Satz made these representations, they both knew it was not true, yet they deliberately misled Plaintiff in order to keep its money flowing into BNI's coffers. Upon information and belief, at the time the Satzs made this representation to Plaintiff, neither Satz had submitted any offers of compromise to the IRS, and none were submitted until August 11, 2016 at the earliest. This, in turn, delayed any substantive response from the IRS until December 7, 2016.

**(ii)    First Amended License and Patent Purchase Agreement**

61.    By September 2016, BNI had yet to extinguish its IRS debt, yet the company required additional capital in order to advance its efforts to bring Strontium 89 to market-ready

15

status. To address this situation, Plaintiff and BNI agreed to amend much of its Patent Purchase

Agreement in order to adjust for additional pre-closing distributions to BNI.

62.     On September 2, 2016, Plaintiff and BNI entered into a "First Amendment" to its

Patent Purchase Agreement to advance the parties' "Closing Date" to the date of execution of

this Amendment, rather than the date BNI satisfied its debt with the IRS. The Amendment also

served to modify the parties' 'Use of Proceeds' Schedule to reflect distributions by Plaintiff to

BNI ahead of its satisfaction of its IRS debt. A copy of the First Amended Patent Purchase

Agreement is annexed herein as **Exhibit "B."**[2]

63.     Effectively, Plaintiff accelerated distribution of its $50,000 "Up Front" payment

to BNI by re-defining the Closing Date as the date the parties executed the First Amended

Agreement. The Amendment effectively altered the Use of Proceeds Schedule. By this time,

Plaintiff had already distributed $10,000 of its $50,000 Upfront commitment. It agreed to

advance an additional $10,000 upon execution of the Amendment September 2, 2016[2], leaving

the $30,000 balance to be paid within 30 days following BNI's satisfaction of its debts, or, at the

very least, having reached an agreement in principle with its creditor(s).

64.     The Amendment also effectively modified Section 3.2(b)(ii) of the parties' initial

Agreement such that Plaintiff would distribute to BNI its 'Day 30' payment of $50,000 no later

than 60 days from the date in which BNI funded the preparation of the Amended New Drug

Application, referred to herein as the "ANDA Filing," and/or undertaking studies or other actions

necessary to complete this filing (*see,* Amendment, Section 3(ii)).

65.     Section 4 of the Amendment was intended to allow for the parties to officially

close on its Agreement ahead of BNI's satisfaction of its debt obligations so that BNI could

---

[2] The actual Amendment is "September 2, 2015," however, this is a ministerial error. The Amendment should have read "2016."

continue receiving financial contributions from Plaintiff while BNI worked to resolve its outstanding debts.[3] The 'Use of Proceeds' Schedule was amended to reflect the foregoing revisions.

66.     In accordance with its Amended Agreement, on September 7, 2016, Plaintiff distributed to BNI an additional $10,000 to be used by BNI in its work on Strontium 89.

67.     On September 20, 2016, as a condition to further negotiations, the IRS demanded BNI make a good faith deposit of $7,000. Plaintiff funded this distribution. Beginning that month, and continuing thereafter for the following five months, Plaintiff also paid down its negotiated debt to BNI's former landlord, eventually funding the full $62,500 negotiated settlement.

**E.     BNI Fails to Honor Its Contractual Obligations –
        The Satzs Fraudulently Induces Plaintiff's Allocation of
        Additional Cash and Stock**

68.     Also in September 2016, concerned about the slow progress being made by BNI in resolving its debt issue and moving ahead on its Strontium 89 re-development efforts, members of Plaintiff's management and support team, including individuals from the UK and Cayman, flew to Miami to meet with Roseanne and Stanley Satz. By the conclusion of this meeting, the parties had agreed on a new February 2017 Launch Date. Another meeting between management teams was held in Florida on November 4, 2016 during which time Roseanne and Stanley Satz confirmed all of their prior representations, including a reaffirmation of a mid-February Launch Date.

---

[3] The Amendment further provided that in the event BNI's aggregate sum needed to settle its pre-existing obligations differed materially from the $163,500 previously allocated for this purpose, Plaintiff had the option of terminating the Agreement and walking away, or work with BNI in good faith to adjust the consideration Plaintiff would pay to BNI for the license and acquisition of Strontium 89.

69.     On January 7, 2017, at the behest of Roseanne Satz, Plaintiff wired BNI an additional $115,000 which Roseanne and Stanley Satz claimed was needed by and earmarked for Polatom, the company that manufactured a specific isotope BNI needed in the manufacture of Strontium 89. While BNI did require funds to acquire this isotope from Polatom, the Satzs deliberately lied to Plaintiff about how much money was actually required, inflating the actual cost by over 300%.

70.     Roseanne and Stanley Satz deliberately failed to inform Plaintiff that BNI carried a large outstanding balance with Polatom, and that a large percentage of the money BNI claimed it needed in order to acquire this isotope, was actually going to pay down BNI's previous debt with Polatom – a debt having nothing to do with Plaintiff. The Satzs deliberately lied to Plaintiff in order to induce Plaintiff into forwarding to them a far larger sum of money than was needed in order to advance the re-commercialization of Strontium 89.

71.     By February 2017, little progress had been made toward achieving a Launch Date and thus another promised milestone came and went. Seeking answers as to why this project was so delayed, Roseanne's answers were vague and nonsensical to Plaintiff. To add insult to injury, the Satzs attempted to charge Plaintiff for the time they had expended doing nothing more than what was required of them under the parties' Agreement.[4] By this point in time, Plaintiff had paid close to $200,000 and yet BNI had failed to meet one milestone or resolve its IRS debt.

72.     At that time, the Satzs assured Plaintiff that Polatom would deliver product for validation runs of Strontium 89 in early March 2017, and that Plaintiff could begin manufacturing and selling this Drug during these runs.

---

[4]BNI sent Plaintiff an invoice for $600 for the Satz' review of Plaintiff's press release, and another for $6,000 to cover the Satzs' time in auditing their own manufacturing facility – all obligations covered under the parties' Agreement.

73.     Based upon these representations, Plaintiff prepared a press release outlining the timeline(s) the Satzs had provided. However, before Plaintiff could issue its release, the Satzs watered it down, allowing Plaintiff to state only that production could begin in the second quarter of 2017.  Plaintiff did not know that the Satzs' representations in or about March 2017 of a second quarter Launch Date were completely fabricated; their lies intended to keep Plaintiff's money flowing to their company.

74.     Toward that end, on or about March 3, 2017, under the threat of ceasing all development efforts, Roseanne Satz demanded yet more compensation from Plaintiff, this time for herself and her father Stanley, ignoring the terms of the parties' Agreement, arguing that they were devoting more time to this project than anticipated and thus, they should receive additional compensation.

75.     Fearing it had no choice but to give in to what Plaintiff viewed as the Satzs' extortion, and concerned about forfeiting all of the money and stock Plaintiff had invested in this project up to that time as well as the maintenance of Plaintiff's market capitalization, Plaintiff felt compelled to comply with the Satzs' demand, and agreed to send BNI an additional $15,000 per month.

76.     By the end of March 2017, the Satzs informed Plaintiff that the first runs of final product would occur at IsoTex, its Texas-based manufacturing facility, in April 2017, but also advising Plaintiff that IsoTex would first have to perform what is known as a "cold run" to ensure that all of its equipment was properly calibrated and working properly.  Following this cold run, Isotex would then undergo a "hot" run on April 20, 2017.

77.     The foregoing representations were completely untrue and known to be untrue by the Satzs at the time they made them to Plaintiff.  The runs which they stated would occur in April 2017 never occurred at all.

78.     On May 3, 2017, the Satzs provided Plaintiff with a revised timetable which included a production run to occur on May 11, 2017.  That production run also did not occur.

79.     On May 15, 2017, the parties met in Florida to discuss the ever-changing deadlines and to address the numerous delays and expense overruns.  At this meeting, Roseanne Satz became excessively combative, throwing her personal belongings around the room before storming out in a fit of anger.

80.     That same month, according to Roseanne Satz, BNI was finally able to negotiate a resolution with the IRS for $21,000.  After giving BNI credit for the initial $7,000 Plaintiff had previously advanced, Roseanne represented that an additional $14,000 would cover this debt and satisfy the IRS' judgment.  Stanley Satz was familiar with Roseanne's representation and did nothing to correct it.

81.     Based upon Roseanne's representation and Stanley Satz's failure to correct it, Plaintiff promptly sent BNI the $14,000 Roseanne Satz stated was needed to resolve the IRS debt, bringing the total amount Plaintiff advanced for this purpose to $21,000.

82.     Plaintiff later discovered that Roseanne had lied about the amount needed to extinguish this debt; that BNI had only paid the IRS a total of $17,500 of the $21,000 Plaintiff had provided and which Roseanne stated was needed.  To date, BNI has never provided an explanation as to where the additional money went including refusing to share with Plaintiff all of its IRS submissions.

83.     Notwithstanding the foregoing, believing the completion of the development process was imminent, Plaintiff continued to honor its revised commitments to BNI, wiring an additional $30,000 to BNI on June 21, 2017. This sum represented the balance of the initial $50,000 licensing fee the parties agreed upon a year earlier.

84.     On June 27, 2017, the Satzs informed Plaintiff that production would commence on July 20, 2017, well beyond the May 11th date previously promised by them. At about that time, the Satzs also assured Plaintiff that Roseanne would be visiting IsoTex's plant during the second week of August 2017 to inspect its latest estimated production runs which were to have begun by then. In the interim, several items, such as National Standards Testing ("NIST"), insurance quotes and distribution contracts had to be completed.

85.     The Satzs assured Plaintiff that BNI had secured all of these items and all that remained was some minor updating. As with nearly everything else the Satzs had told Plaintiff, this too proved untrue. In fact, BNI had made no material progress on any of the aforementioned agreements, and the July production date came and went without commencement of production.

86.     On or about July 20, 2017, Roseanne emailed Plaintiff to advise that BNI would again miss its promised deadline. Along with her myriad of excuses, Roseanne provided Plaintiff with a number of invoices, including one for $5,800 for storage for the period November 2016 through July 2017. BNI was charging Plaintiff for storing items which it should have forwarded to IsoTex weeks, if not months before if it was to meet the deadlines the Satzs had initially laid out.

87.     By the end of August 2017, Roseanne had not visited IsoTex, as promised, nor had production begun, also as promised. Instead, Roseanne and Stanley Satz promised Plaintiff

21

a new Launch Date, this one in October 2017. They assured Plaintiff that by this time, Iso Tex would be in a position to satisfy Plaintiff's manufacturing needs for the commercial market.

88.     In anticipation of this latest Launch Date, on October 5, 2017 Plaintiff launched its own website www.PainFreeCancer.com relying heavily on the Satzs' editorial contributions and content as alleged regulatory experts and consultants. Additionally, Plaintiff issued a press release to the public including its more than 6,000 shareholders regarding expected launch in October 2017. Plaintiff came to learn that much of what the Satzs wrote was plagiarized, inaccurate or substantially out of compliance with current regulations. Also inaccurate was Plaintiff's representation, based entirely upon the Satzs' assurances that the Drug would become commercially available in October 2017. By mid-October it had once again become clear to Plaintiff that the promised Launch Date would not be met.

89.     On October 18, 2017, Roseanne Satz travelled to New York to meet with Denis Corin, Plaintiff's CEO, to inform him that IsoTex would not be producing Strontium 89. Roseanne claimed that IsoTex was attributing its decision to the stresses caused by Hurricane Harvey, which had struck the Houston area in August 2017, as well as IsoTex's own internal corporate issues.

90.     Following this meeting, Plaintiff confronted both Roseanne and Stanley Satz, reminding them that the hurricane and IsoTex's internal issues were but two excuses in a long line of excuses and missed deadlines, none of which would have impacted BNI had the company performed its contractual obligations in any material respect up to that time.

91.     Upon information and belief, based upon the foregoing, Roseanne Satz became concerned that they could no longer string Plaintiff along; that Plaintiff might pull out of the

Agreement based upon all of BNI's numerous lies and contractual breaches, and in doing so, cut off all further funding to BNI.

92.     Upon further information and belief, based upon the foregoing, Roseanne assured Plaintiff that in fact, IsoTex, now under new control, was indeed willing to proceed as Plaintiff's manufacturer, and that IsoTex was committed to meeting the previously established launch plan. Roseanne also informed Plaintiff that IsoTherapeutics, another Texas drug manufacturer, was prepared to serve as a secondary manufacturing source should that need arise and that she would ensure its readiness to step in as needed.

93.     While Plaintiff remained skeptical, Roseanne Satz's gambit worked, and on November 7, 2017, arrangements were made for Plaintiff to inspect both manufacturing facilities accompanied by Roseanne Satz.

94.     During this visit, Plaintiff discovered what both Roseanne and Stanley Satz already knew but had failed to disclose – that the IsoTex facility was in no condition to manufacture Strontium 89 and that it was unlikely to even pass a current FDA inspection. Between the condition of this facility and the obvious dysfunction which was occurring within IsoTex's management, the situation appeared unresolvable.

95.     In desperation, the parties were forced to turn to IsoTherapeutics to serve as its new manufacturer, a decision that would cause further delays since this change required a filing with the FDA in the form of what is known as a "CBE 30." To soften the blow to Plaintiff, and to induce Plaintiff into continuing to pay BNI an extra-contractual consulting fee of $15,000 per month, Roseanne and Stanley Satz assured Plaintiff that a first run of Strontium 89 would be accomplished on December 22, 2017 with the balance of the run by the first week of January

23

2018. However, this goal could not be accomplished until at least 30 days had expired following the filing of the CBE 30.[5]

96.  The Satzs' representations that they could and would get the CBE 30 filing completed within a few days, was yet another of their many fabrications designed to string Plaintiff along. In fact, the form Roseanne Satz promised would be ready for filing within days took another four months and was not filed until March 2018 costing Plaintiff an additional $60,000 in extra-contractual fees. Even then, Roseanne continued to complain to Plaintiff that its payments were insufficient to adequately compensate her and her father for their time and efforts.

97.  Upon information and belief, during the course of the previous two years, Roseanne and Stanley Satz continued working on the development of their other businesses, including Advanced Innovative Partners/Advanced Imaging Projects, Nuclear Entertainment Group, Playmore Couture (a lingerie company), and Ms. Rose Theory (a music promotion label), among others.

98.  Upon information and belief, these companies were developed and/or funded in whole or in part, through the Satzs' misappropriation of Plaintiff's money which was earmarked entirely for the recommercialization of Strontium 89.

99.  Believing that BNI had to be nearing the final stages of development and the commercial launch of the Drug, Plaintiff was persuaded by Andrew Satz, Roseanne's brother, to not only continue to fund BNI's progress, but to increase BNI's consulting fees, but only temporarily and based upon BNI hitting certain milestones.

---

[5]A CBE 30 Supplement must be filed at least 30 days before a drug product manufacturer goes to distribution in the event it is making moderate manufacturing changes. The term "CBE" means "changes-being-effected".

24

Case 1:19-cv-01483-GHW   Document 1-2   Filed 02/15/19   Page 25 of 46

100.    Andrew suggested a figure that equated to Plaintiff having to advance another

$45,000 to BNI on December 1, 2017, with an additional performance-based milestone payments

which could amount to a total of another $100,000 if BNI completed its milestones by February

28, 2018.

101.    Again, Plaintiff felt as if it had no choice but to proceed, hoping that in time, it

could amortize its enormous outlay of capital.  Based upon Andrew Satz's latest representations,

on December 21, 2017, Plaintiff again issued a press release, its year-end update, in which it

summarized the events and attempted to justify the delays.

102.    With BNI's review and approval, Plaintiff informed its shareholders that its

product Launch would occur in mid-January 2018.

103.    In reliance upon BNI's most recent launch date, Plaintiff bought a full-page

advertorial in a *USA Today Media Planet* special publication on the Opioid Crisis at a cost of

$35,000 for publication in March 2018. This additional expenditure turned out to be a complete

waste of time and money as Roseanne Satz did not file the CBE 30 Supplement until March 14,

2018.  Ahead of this CBE filing, Plaintiff insisted upon reviewing the submission in order to

prevent any further avoidable delays.  However, BNI denied all of Plaintiff's requests.

104.    Further, on March 14, 2018, Plaintiff sent a congratulatory email followed by a

second email pointing out that although it was nice that the CBE 30 was filed, it was more than a

year later than previously represented by the Satzs. In response to that email, Andrew Satz in his

capacity as an officer of BNI and Advanced Innovative Partners, informed Plaintiff that neither

BNI nor Advanced Innovative Partners was willing to continue performing unless and until an

apology from Plaintiff was received. Needless to say, this demand not only caused great concern

25

in Plaintiff, but also significant confusion as Advanced Innovative Partners had not been represented as a party to this transaction until such time.

105.    In late March 2018, Plaintiff received more bad news when it learned for the first time that IsoTherapeutics, the new manufacturer the Satzs had secured, was not a licensed distributor or wholesaler. This basic information was something the Satzs had to have known about or should have known about from the beginning.

106.    Since IsoTherapeutics was not licensed in all 50 states, and since no product could be shipped into a state without the manufacturer being licensed in it, even if Plaintiff's CBE 30 had been approved by the FDA, Plaintiff could not ship or embark upon its national distribution plan for its products until IsoTherapeutics became licensed in every state since.

107.    This news was so stunning this late in the development process that upon hearing it, one of Plaintiff's leading consultants whom Plaintiff had hired to work with BNI, resigned immediately, blaming BNI's consistent gross incompetence and deception, telling Plaintiff that he refused to be associated with BNI in any way going forward.

108.    Unfortunately, both Plaintiff and BNI both knew that notwithstanding the increasing delays, BNI's incessant lies and deceptions, having already invested nearly one million dollars, Plaintiff had no choice but to continue forward with BNI hoping to get to the completion stage where it could begin to recoup its investment.

109.    Relying upon this fact, on March 23, 2018, Roseanne Satz informed Plaintiff that it should be expecting yet another invoice from BNI, this one for $600,000 which, Ms. Satz claimed, represented a balance of fees due to her company covering the period from November 2017 to March 2018.  BNI also demanded an additional 45,000 shares of Plaintiff's common stock.

110.    At no time were these fees ever discussed, and they were in addition to all of the other extra-contractual fees Plaintiff had already been forced to pay BNI in order to advance the project.

111.    The $600,000 invoice Plaintiff received from BNI was completely unsupported by any receipts, invoices or other customary support. Upon Plaintiff's insistence that BNI provide it with documents substantiating BNI's alleged right to this additional money, Roseanne Satz hastily sent Plaintiff self-serving, "supporting" invoices that were solely created to match BNI's fabricated numbers. As an example, such invoices included "consulting fees" for Roseanne Satz and her father Stanley dating back to January 2017. Clearly, BNI was creating backdated invoices in real time in an attempt to manufacture support for its outlandish and fraudulent acts.

112.    On April 4, 2018, Plaintiff issued a letter to Ms. Satz summarizing material parts of the parties' Agreement, BNI's commitments, and a brief history of what had and had not transpired up to that date. A copy of this letter is annexed herein as **Exhibit "C."**

113.    Notwithstanding BNI's most recent demands, all of which Plaintiff found to be outrageous and extortionate, Plaintiff countered by offering to pay BNI some additional fees but based solely on BNI achieving certain milestones.

114.    Plaintiff agreed to continue to pay BNI $15,000 per month for an additional 3 months plus an additional $115,000 in cash conditioned upon the FDA's approval of the CBE 30 or other document(s) required by the FDA. Plaintiff also agreed to allocate an additional $100,000 worth of its common stock to BNI once the product had been released commercially and Plaintiff had achieved sales of $50,000. The foregoing was in addition to all fees owed or

27

required by the FDA, and the production and marketing expenses necessary to return Strontium 89 back to market.

115.    On April 24, 2018, Roseanne Satz informed Plaintiff that the FDA had rejected the CBE 30 filing she had submitted, the FDA informing her that she needed to submit a full PAS (Prior Approval Supplement) instead. While Plaintiff was initially aware of the fact that the FDA might make this request, it nevertheless came as a total surprise to Plaintiff based upon Roseanne Satz's repeated claims that the CBE 30 she had submitted was properly done and would ultimately be accepted by the FDA.

116.    Fearing this was the last straw, Roseanne Satz immediately informed Plaintiff that she could have the PAS filed "this next week," but Ms. Satz once again insisted upon more money before she would move forward.

117.    Notwithstanding the fact that more than two years had passed since the parties had entered into their initial LOI and almost as long since they signed their Patent Purchase Agreement, unlike BNI, Plaintiff had absolutely nothing to show for their investment of cash and stock.  While Plaintiff felt it had no choice but to attempt to negotiate some financial resolution with BNI in order to advance the project to its final stage, this time Plaintiff insisted it receive something of value - BNI's formal assignment of the Drug (the ANDA) to Plaintiff.

118.    Plaintiff already had a contractual right to acquire this asset from BNI for the consideration set forth in the parties' Agreement and which Plaintiff had more than paid. Thus, Plaintiff was seeking nothing more than what it was ultimately entitled to.  BNI refused to even consider Plaintiff's request leaving the matter unresolved.

119.    In or about February 2018, to ensure that the pre-commercial efforts and communications with the FDA were being handled in the most efficient manner, Plaintiff hired a

28

FILED: NEW YORK COUNTY CLERK 12/28/2018 04:28 PM
NYSCEF DOC. NO. Case 1:19-cv-01483-GHW Document 1-2 Filed 02/15/19 Page 29 of 46 NYSCEF: 12/28/2018

INDEX NO. 656480/2018

third-party consulting firm at a budgeted cost of $30,000 plus expenses, to assist BNI in any way possible.

120.    Initially, Roseanne Satz refused to share any information with such consultant. However, after the FDA rejected the CBE 30 filing on February 24, 2018, and it became clear to her that she did not possess the skills or knowledge necessary to complete the process, on or about April 27, 2018, Roseanne Satz relented and provided Plaintiff's consultant with a copy of the filing.

121.    Shortly thereafter Plaintiff's consultant informed Plaintiff that the CBE 30 had been filed in a disorganized and incomplete form and likely never had a chance of approval.

122.    On May 15, 2018, representatives of both companies met in New York to discuss the status of their project and how to reach the finish line.  As to the latter issue, getting the PAS filed and approved by the FDA was the most important next step. Roseanne Satz represented to Plaintiff that she could have a final draft of the PAS completed and ready for review by May 25, 2018.  She further represented that by June 15, 2018, the final edited PAS could be ready for submission.

123.    To expedite the submission and review process, and to minimize another FDA rejection, Plaintiff agreed to continue to retain the FDA expert at significant expense, to review the draft submission as it was being prepared and to provide her feedback to BNI on this critical filing.  Roseanne Satz agreed that more expert input would be helpful to this process.

124.    Notwithstanding Roseanne's agreement to work with Plaintiff's consultant, including her agreement to include Plaintiff's consultant in the process as it was unfolding, she consistently delayed sending Plaintiff's consultant any documents.  When Roseanne Satz did

eventually send Plaintiff's consultant documents, they were found to be incomplete and insufficient to withstand FDA scrutiny.

125.    Once again, Roseanne Satz's assurance of a June 15, 2018 filing date proved false. No filing was made on that date. Following this missed deadline, Plaintiff's FDA consulting team called Plaintiff to express their concern that BNI was incapable of producing a document that would be acceptable to the FDA.  This was followed by a letter from the consulting firm's CEO on July 16, 2018 outlining their professional opinion and concerns about how poorly the PAS filing had been organized and its lack of clarity, and cautioning Plaintiff that this filing would likely be rejected on its face.

126.    Following the latest missed deadline, the Satzs again demanded more money based, this time on what they described as the "extra" time and effort they and their team had invested in this project.  Plaintiff made several attempts to reason with the Satzs over the next few weeks, offering BNI more and more money and stock, even going so far as to forward to BNI an additional $10,000 in July.  Notwithstanding the foregoing, knowing the Satzs had Plaintiff in a no-win situation, the Satzs and BNI slow-marched the filing of the PAS until their terms were met.

127.    On August 10, 2018, Plaintiff received an email from Andrew Satz informing Plaintiff that the PAS had been filed.

128.    On August 13, 2018, Plaintiff's Denis Corin sent an email to Andrew, Roseanne and Stanley Satz with what Mr. Corin termed Plaintiff's "ultimate offer" of compromise.  Mr. Corin's email reads as follows:

"Dear Andrew, Rose and Stan,

We have continued to meet you on reasonable terms. Herewith our ultimate offer.

**Filing of PAS and Acceptance by FDA (Day 1)**
QBIO  pays $50,000
QBIO  issues 50,000 shares of common stock to BNI

**FDA PAS Comment Period Completion (GDUFA Schedule from FDA)**
QBIO  pays BNI $25,000 and all expenses owed to date - not exceeding $10,000
QBIO  shares all Strontium-89 marketing and sales strategies with BNI
BNI Assigns ANDA

**Effectiveness of PAS (ISO Approval)**
QBIO  pays $50,000
QBIO  issues 50,000 shares of common stock to BNI

**Post Commercialization - Label Expansion**
QBIO  agrees to negotiate a new royalty arrangement prior to label expansion, to be
effective upon completion of Phase 4, in exchange for material assistance from
BNI.

**Additional BNI Efforts**
Any BNI work over and above the Initial PAS filing will be performed on a pre-
agreed basis between the parties."

A copy of Mr. Corin's email to the Satz family is annexed herein as **Exhibit "D."**

129.    The following day, August 14, 2018, Andrew Satz provided BNI's response, as

follows:

"Denis, Please allow this to serve as acceptance of the offer. Best, Andrew"

A copy of Andrew Satz's email is annexed herein as **Exhibit "E."**

130.    Notwithstanding that Plaintiff had no assurances that the PAS filing had been

accepted for review by the FDA, Plaintiff nevertheless honored its commitment by sending

$50,000 to BNI as consideration agreed in the August 13th email.  Plaintiff also issued an

additional 50,000 shares of its common stock, except at the request of Roseanne Satz, the stock

was issued in her name rather than in the name of BNI.

31

131.    Rather than approve the PAS submitted by BNI in August 2018, on or about October 2, 2018, the FDA requested additional information relating to Strontium's microbiology testing and procedures, insisting BNI provide this information to the FDA by October 19, 2018.

132.    On October 19, 2018, Plaintiff received an email from Roseanne Satz indicating that the information requested by the FDA had been submitted and as such, Plaintiff was required to send BNI its next milestone payment – this one in the amount of $25,000 per the parties' supplemental agreement reached in August 2018.

133.    In response to Roseanne Satz's email, Plaintiff informed Ms. Satz that Plaintiff was prepared to make this payment but it also reminded her that BNI was obligated to transfer its ANDA to Plaintiff at the same time, effectively giving Plaintiff all of its intellectual property rights to Strontium 89.  BNI was provided with all of the documentation supporting Plaintiff's exercise of its option to acquire these rights as well as the form of notice to be provided to the FDA to affect the transfer.

134.    BNI informed Plaintiff that it was not willing to transfer the ANDA to Plaintiff notwithstanding that it had a contractual obligation to do so.  While Plaintiff had been willing to send the $25,000, as agreed, it was no longer willing to send any further consideration knowing BNI was unwilling to honor its contractual commitment to transfer the ANDA to it.

135.    Following BNI's October 19th submission to the FDA's request for additional information, the FDA requested yet additional information from BNI, which suggests that BNI's responses were inadequate and/or incomplete.  To date, BNI has refused to share the FDA's supplemental request or BNIs response with Plaintiff nor update it on whether or not its subsequent response has been accepted or reviewed.

32

136.     On or about November 6, 2018, Plaintiff received a formal letter from BNI, which was copied to its legal counsel, advising Plaintiff that it had been late or missed a payment obligation, and that Plaintiff now owed it additional penalties and interest without any supporting explanation.  The Satzs also disputed that Plaintiff had the right to Strontium 89.

137.     In sending its payments, Plaintiff demanded BNI honor its obligation to transfer the ANDA to it as required under the parties' agreement.  However, BNI refused to transfer the ANDA as it was required to do, and despite repeated demands by Plaintiff that BNI honor its contractual obligation, BNI refused all demands and to this day, said request remains unfulfilled.

138.     Upon information and belief, BNI's October 19, 2018 submission was deficient insofar as following its submission, the FDA requested it provide it with yet additional information.  However, BNI has refused to tell Plaintiff what those questions are or whether adequate answers have been provided to the FDA.

139.     To date, Plaintiff has invested a total of $910,728.58 directly in this deal and more into related supporting efforts and consultants.  It has paid $83,499 to BNI's creditors to settle its outstanding debt obligations; $388,629.58 to BNI's various vendors for development costs, including raw materials; and $438,600 directly to BNI, which includes consulting services that were not included in the parties' original Agreement.  In addition to the foregoing, Plaintiff has also transferred 50,000 shares of its common stock to BNI, and an additional 50,000 shares to Roseanne Satz.

140.     Notwithstanding the foregoing, to date, Plaintiff has received nothing of value for the consideration it has paid directly and indirectly to BNI and to Roseanne Satz.

33

## AS AND FOR A FIRST CAUSE OF ACTION
### (*Breach of Contract against BNI*)

141.     Paragraphs "1 through "140" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

142.     Plaintiff and Defendant BNI were parties to a legally enforceable and fully binding contract – to wit, the Patent and Technology License and Purchase Option Agreement dated May 30, 2016, as amended from time to time.

143.     Plaintiff performed all material obligations under the terms of the Patent Purchase Agreement.

144.     Notwithstanding the foregoing, Defendant BNI failed to perform numerous of its contractual obligations under the Patent Purchase Agreement, including, but not limited to the following:

(a)  Failed to adequately prepare and submit the required FDA forms;

(b)  Failed to timely procure a FDA-approved manufacturing facility;

(c)  Failed to meet production deadlines and timelines;

(d)  Misappropriated financial resources earmarked specifically for the development of Strontium 89 – instead misusing a significant portion of those resources for other business entities and business developments having nothing to do with Plaintiff or Strontium 89;

(e)  Continuously demanding and receiving additional monies from Plaintiff not contemplated under the parties' Agreement, and doing so under constant threat of terminating its relationship with Plaintiff;

(f)  Failing to provide necessary technical support as and when requested and needed by Plaintiff;

34

(g) Failing to execute the necessary documents, including the ANDA, so as to effectively transfer BNI's rights in Strontium 89 to Plaintiff; and

(h) Failing to honor Plaintiff's exclusive license rights relative to Strontium 89.

145.    All of the foregoing contractual breaches committed by BNI were material and were without just cause.

146.    By virtue of BNI's numerous material contractual breaches of the parties' Patent Purchase Agreement, Plaintiff has been caused to sustain substantial monetary damages, the final amount of which are to be proven at trial but believed to be in excess of $1,000,000.

### AS AND FOR A SECOND CAUSE OF ACTION
### (*Fraudulent Inducement – Roseanne Satz, Stanley Satz, BNI*)

147.    Paragraphs "1 through "146" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

148.    In or about January 2016 through March 2016, the period of time during which the parties were negotiating the terms of their Agreement, Defendants Roseanne Satz, for herself, Stanley Satz for himself, and both (collectively "Satzs") for BNI, purposely misled Plaintiff as to how much it would cost and how long it would take to return Strontium 89 to marketability.

149.    Both Roseanne and Stanley Satz represented to Plaintiff that BNI could complete Strontium 89's redevelopment to marketability within 200 days and for no more than $850,000.

150.    The Satzs further represented that each possessed the requisite skills and knowledge to complete the re-commercialization process within the time frame set forth hereinabove.

151.    At the time Satzs made these representations, each knew that they were being relied upon by Plaintiff in deciding whether or not to enter into a contractual relationship with BNI, and each knew that their representations were false.

35

152.    Roseanne and Stanley Satz each deliberately made these representations for the sole purpose of inducing Plaintiff to enter into the Patent Purchase Agreement, notwithstanding that neither Satz intended to allow BNI to honor its Agreement to transfer its rights to Strontium 89 to Plaintiff after it had obtained from Plaintiff the stock and cash called for in the Agreement.

153.    Also at the time the Satzs were negotiating what became the parties' Patent Purchase Agreement, each knew but deliberately failed to inform Plaintiff that BNI owed substantial sums of money to various creditors, including suppliers of raw materials necessary for the recommercialization efforts;

154.    The Satzs knew but deliberately failed to inform Plaintiff that BNI owed more than $500,000 to its previous landlord, and that this landlord had obtained a money judgment against BNI for at least $500,000.

155.    The Satzs knew but deliberately failed to inform Plaintiff that BNI owed a substantial sum of money to the IRS, and that the IRS had obtained a money judgment against BNI for the full amount owed, plus additional penalties and interest.

156.    The Satzs knew but deliberately failed to inform Plaintiff that BNI would be unable to convey its rights in Strontium 89 free and clear of any liens and/or encumbrances to Plaintiff in accordance with the terms of the Patent Purchase Agreement.

157.    The Satzs knew that the information each intentionally withheld from Plaintiff was information Plaintiff needed to have in order to make an informed decision as to whether or not  to enter into the Patent Purchase Agreement, and that had it been provided with this information, Plaintiff would not have entered into its Agreement with BNI under the terms set forth therein, if at all.

36

FILED: NEW YORK COUNTY CLERK 12/28/2018 04:28 PM
NYSCEF DOC. NO. Case 1:19-cv-01483-GHW   Document 1-2   Filed 02/15/19   Page 37 of 46

INDEX NO. 656480/2018
NYSCEF: 12/28/2018

158.    That the foregoing constitutes the fraudulent inducement of Plaintiff by Roseanne and Stanley Satz individually and on behalf of BNI.

159.    At all relevant times, Plaintiff did rely upon both Satzs' material misrepresentations and material omissions in electing to enter into its Agreement with BNI, and it did so to its detriment.

160.    By virtue of the Satzs' and BNI's fraudulent inducements, Plaintiff has been caused to sustain substantial damages for which it is entitled to recovery against these Defendants.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (*Fraud – Roseanne Satz, Stanley Satz, BNI*)

161.    Paragraphs "1 through "160" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

162.    Following the parties' entry into their Agreement, Roseanne and Stanley Satz routinely and deliberately continued to misrepresent critical facts to Plaintiff solely for the purpose of inducing Plaintiff to continue to honor its contractual obligations, all the while knowing that BNI had no intention of ever transferring its rights to Strontium 89 to Plaintiff.

163.    Both Satzs knew that had they had provided untruthful information regarding their company's finances, BNI's inability to secure a FDA-approved manufacturing facility, and their inability to prepare and submit FDA applications in a form acceptable to the FDA.

164.    Both Satzs knew that Plaintiff would not have entered into its contractual relationship with BNI or provided BNI and/or its creditors with nearly $1,000,000 of its cash, nor would Plaintiff have transferred tens of thousands of its common shares to BNI and/or to Roseanne Satz individually but for the Satzs' numerous misrepresentations.

165.    For instance, in or about June 2016, the Satzs misrepresented the amount of money BNI would require in order to purchase from its supplier Polatom certain isotopes needed in the production of Strontium 89.

166.    In preparing the parties' revised Use of Proceeds Schedule (*see,* Agreement, Schedule 3.2(b)), the Satzs represented to Plaintiff that BNI required $50,000 by Day 30 to acquire this raw material from Polatom knowing that this was a grossly inflated sum – that the vast percentage of this amount was to satisfy a portion of BNI's outstanding debt owed to Polatom – a debt having nothing to do with Plaintiff or its current Agreement with BNI.

167.    The same is true with respect to the Satzs' representation to Plaintiff that an additional $75,000 would be needed in order to acquire more isotopes from Polatom on Day 60 of the parties' Use of Proceeds Schedule, knowing that a large percentage of this money was to satisfy a portion of BNI's existing debt owed to Polatom.

168.    In or about June 2016, the Satzs purposely misinformed Plaintiff that they would have BNI's outstanding debt with the IRS completely resolved by the end of that month when in fact both knew this wasn't the case; that they had failed to provide the IRS with information it had requested as a condition to further settlement talks.

169.    At a meeting between the parties which occurred in September 2016, the Satzs assured Plaintiff that by February 2017, Strontium 89 would be ready for manufacture.  At the time they made this representation, they knew it to be false; that Strontium 89 would not be ready for launch anywhere near that time, if ever.

170.    On January 7, 2017, Roseanne Satz beseeched Plaintiff to send an additional $115,000 which she and Stanley had claimed Polatom needed in order to sell BNI the necessary

38

isotopes. At the time Plaitniff was provided the Satzs' estimate as to what was needed by Polatom, they had intentionally inflated the cost to acquire the isotopes by over 300%.

171.    After the promised February 2017 Launch Date came and went, Roseanne and Stanley Satz again deliberately lied to Plaintiff, this time informing Plaintiff that the Launch Date would occur in early March 2017. At the time they made this promise, both knew it to be false.

172.    By the end of March 2017, Roseanne and Stanley Satz purposely misinformed Plaintiff that the first runs of final product would occur at IsoTex in April 2017 with final runs occurring on or about April 20, 2017. This was a complete fabrication, designed solely by the Satzs to keep Plaintiff's financing flowing, which it did.

173.    On May 3, 2017, the Satzs again lied to Plaintiff, this time informing Plaintiff that a production run of Strontium 89 would occur on May 11, 2017 despite knowing this was not going to occur, nor did it.

174.    Also on or about May 2017, the Satzs lied to Plaintiff about how much money was actually needed in order to satisfy BNI's negotiated debt with the IRS, telling Plaintiff BNI needed thousands of dollars more than what the IRS had actually agreed to accept in satisfaction of this debt.

175.    The Satzs lied to Plaintiff in order to induce Plaintiff into sending BNI more money than was actually needed in order to satisfy the IRS's debt thereby allowing the Stazs to pocket the difference or use that money in furtherance of their other business ventures.

176.    On June 27, 2017, the Satzs misinformed Plaintiff yet again, informing Plaintiff that production would commence on July 20, 2017. At the time they made this representation, both Satzs knew it to be untrue.

39

177.    By the end of August 2017, the Satzs misinformed Plaintiff that BNI would be ready to Launch Strontium 89 by October 2017 notwithstanding the fact that both knew this was a complete and utter lie.

178.    In or about November 2017, the Satzs represented to Plaintiff that an alternate FDA-approved manufacturing source – IsoTherapeutics – had been secured thereby causing Plaintiff to believe that the Satzs had secured a manufacturer which was legally capable of shipping the Drug into all fifty states.

179.    At the time the Satzs made this representation, they both knew that IsoTherapeutics was not a licensed wholesaler or distributor and as such, it could not manufacturer and ship Strontium for Plaintiff into the 50 states until additional steps had been taken that would allow Plaintiff to ship its orders throughout the country.

180.    All of the foregoing misrepresentations made by the Satzs were known by them to be false at the time they were made, and that the Satzs made these misrepresentations solely for purposes of inducing Plaintiff to continue financing BNI's operations.

181.    In addition to all of the foregoing intentional misrepresentations made by Roseanne and Stanley Satz to Plaintiff, both Satzs also routinely lied to Plaintiff about where their financing was actually going. In truth, upon information and belief, Roseanne and Stanley Satz had re-directed some of Plaintiff's funds specifically earmarked for the development of Strontium 89 alone to one or more of their other legal entities in order to fund their operations and/or development of their products and/or services.

182.    At all times, Plaintiff relied upon all of the Satzs' representations, and it did so to its detriment. Plaintiff continued to fund what it believed were BNI's development and consulting costs and issuing Satz and BNI common shares of its stock notwithstanding the fact

40

that neither Roseanne nor Stanley Satz had any intention of ever transferring the ANDA (proof of ownership) to Plaintiff or honoring Plaintiff's license rights.

183. The Satzs' conduct constitutes fraud.

184. By virtue of the Satzs' fraud and deceit, Plaintiff has been caused to suffer substantial damages for which it is entitled to recover from them individually, as well as from BNI, on whose behalf both were acting.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (*Specific Performance - BNI*)

185. Paragraphs "1 through "184" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

186. Pursuant to the parties' Agreement, Defendant BNI agreed to transfer all of its rights to Strontium 89 to Plaintiff in exchange for an agreed-upon sum of money and shares of Plaintiff's common stock, all of which Plaintiff paid, and more.

187. Exclusive ownership of these rights, especially world-wide ownership of them, has a special value which cannot readily be determined, and not easily obtained through an award of simple damages.

188. Because Plaintiff paid Defendant BNI all of the consideration for these intellectual property rights, Plaintiff is entitled to the benefit of its investment and its bargain with BNI.

189. The intellectual property rights at issue concern a product (Drug) that is unique in kind and quality and suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure.

190. Plaintiff has made numerous demands for the transfer of this asset, all of which have been refused by BNI and the Satzs without just cause.

41

191.    Because of the nature of the product, its uniqueness, its FDA approval, and because replacing this product with another FDA approved product of similar nature, price and quality is impossible or nearly impossible at this juncture, Plaintiff has no adequate remedy at law and absent this equitable relief, Plaintiff will likely suffer irreparable damages.

192.    For this reason, Plaintiff is entitled to the benefit of its bargain with Defendant BNI, and an order and judgment should issue compelling BNI to take all necessary steps to effectuate the transfer of the exclusive, worldwide rights associated with this asset to Plaintiff in perpetuity.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (*Injunctive Relief - BNI*)

193.    Paragraphs "1 through "192" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

194.    Because Plaintiff and Defendant BNI entered into an agreement whereby Plaintiff acquired the exclusive, worldwide rights to Strontium 89 from BNI, first by way of an exclusive license, and thereafter by acquisition, and because Plaintiff paid BNI more than the consideration agreed upon between them, contractually, and as a matter of law, Plaintiff is the exclusive holder of all rights to Strontium 89.

195.    As the exclusive holder of these rights, no one but Plaintiff has the lawful right to manufacture, distribute, sell, market, develop, promote and/or otherwise exploit commercially Strontium 89 anywhere in the world.

196.    Notwithstanding the foregoing, upon information and belief, BNI is threatening and/or has threatened to infringe upon Plaintiff's exclusive rights by continuing to develop, manufacture, market, license, sell and/or otherwise commercially exploit for itself the rights to Strontium 89.

197.    Defendedant BNI's conduct constitutes an interference with and an infringement upon the rights exclusively granted to and owned by Plaintiff.

198.    Absent an Order of the Court permanently enjoining BNI's interference and infringement of Plaintiff's rights relative to Strontium 89, Plaintiff will be irreparably harmed.

199.    Because Plaintiff has the absolute right to this Drug, and because Plaintiff has no adequate remedy at law absent the granting of this equitable relief, the balancing of the equities weighs in favor of granting Plaintiff's request for permanent injunctive relief.

200.    Based upon the foregoing, Plaintiff respectfully requests an Order permanently enjoining Defendant BNI and/or any of its principals, inclusive of the Satzs, from infringing upon the rights it previously granted exclusively to Plaintiff.

**AS AND FOR A SIXTH CAUSE OF ACTION**
*(Accounting – Advanced Innovative Partners/Advance Imaging Products, Inc., Nuclear Entertainment Group, Inc., Playmore Couture, Inc. and Miss Rose Theory)*

201.    Paragraphs "1 through "200" of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

202.    Upon information and belief, Roseanne and Stanley Satz, individually or through BNI, misappropriated monies which were provided by Plaintiff and which BNI was required to use solely in the re-development and re-commercialization of Strontium 89, using a portion of these monies to fund the operations of one or more of their other businesses, and/or the development of products and/or services provided by one or more of these entities.  Said entities consist of Advanced Innovative Partners/Advance Imaging Products, Inc., Nuclear Entertainment Group, Inc., Playmore Couture, Inc., and Miss Rose Theory.

203.    Plaintiff is entitled to an accounting by these Defendants to determine how much of Plaintiff's monies, if any, were misappropriated by them.  To the extent it is proven that

43

monies were misappropriated, Plaintiff is entitled to a judgment against said entity(ies) for the amount missappropriated by it (them).

WHEREFORE, Plaintiff respectfully requests a Judgment against Defendants, as follows:

(a) On Plaintiff's First Cause of Action, a judgment against Defendant BNI in an amount to be proven at trial but believed to be in excess of $1,000,000;

(b) On Plaintiff's Second Cause of Action, a Judgment against Defendants Roseanne Satz, Stanley Satz and BNI in an amount to be proven at trial but believed to be in excess of $1,000,000;

(c) On Plaintiff's Third Cause of Action, a Judgment against Defendants Roseanne Satz, Stanley Satz and BNI in an amount to be proven at trial but believed to be in excess of $1,000,000;

(d) On Plaintiff's Fourth Cause of Action, a Judgment against Defendant BNI compelling BNI's specific performance – to wit, an Order directing BNI to transfer all rights to Strontium 89 to Plaintiff;

(e) On Plaintiff's Fifth Cause of Action, a Judgment against Defendant BNI permanently enjoining BNI from infringing Plaintiff's exclusive rights to Strontium 89;

(f) On Plaintiff's Sixth Cause of Action, a Judgment directing Defendants Advance Imaging Products, Inc., Nuclear Entertainment Group, Inc., Playmore Couture, Inc and Miss Rose Theory to account to Plaintiff for any monies it may have misappropriated directly or indirectly from Plaintiff; and

(g) For such other and further relief as to this Court may deem just and proper.

Respectfully submitted,

ORTOLI ROSENSTADT, LLP.

By:    Marc S. Gottlieb
       366 Madison Avenue, 3rd Floor
       New York, New York 10017
       (212) 829-8943 (telephone)
       (866) 294-0074 (facsimile)

44

To:    BioNucleonics, Inc.
3651 Fau Blvd.
Boca Raton, Florida 33431

Roseanne Satz
c/o Bionucleonics, Inc.
3651 Fau Blvd.
Boca Raton, Florida 33431

Stanley Satz
% Bionucleonics, Inc.
3651 Fau Blvd.
Boca Raton, Florida 33431

Advanced Imaging Products, Inc.
c/o Roseanne Satz
3651 Fau Blvd.
Boca Raton, Florida 33431

Nuclear Entertainment Group, Inc.
c/o Roseanne Satz
3651 Fau Blvd.
Boca Raton, Florida 33431

Playmore Couture, Inc.
c/o Roseanne Satz
3651 Fau Blvd.
Boca Raton, Florida 33431

Miss Rose Theory
c/o Roseanne Satz
3651 Fau Blvd.
Boca Raton, Florida 33431

## VERIFICATION

I, DENIS CORIN, verify the following facts:

I am the Chief Executive Officer of Q BIOMED, INC., the Plaintiff herein.  I am fully familiar with the facts and circumstances surrounding the instant matter, and specifically Plaintiff's Verified Complaint submitted for filing herein.  I have read the foregoing Complaint and affirm that the allegations contained therein are true, except as to those allegations stated to be true upon information and belief, and as to those allegations, I believe them to be true.

Dated: New York, New York
        December 28, 2018

_____
DENIS CORIN

46